In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3874

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

HARVEY ROBINSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 CR 552—**Charles R. Norgle**, *Judge.*

ARGUED APRIL 22, 2013—DECIDED JULY 31, 2013

Before WOOD, TINDER, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Harvey Robinson was asleep on his grandmother's living room sofa when Chicago police officers conducted an early-morning search of her apartment. They were looking for evidence that Robinson was selling marijuana from the premises. After a thorough search, police officers found less than two grams of marijuana, but they also recovered a loaded revolver lying in a laundry basket by the front door.

According to police officers, Robinson twice admitted—at the time of the gun's discovery and during a later stationhouse interrogation—that the revolver was his; Robinson denies making such statements. After lengthy deliberations a jury convicted Robinson of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

On appeal Robinson raises numerous issues, only three of which require resolution here. He argues first that the revolver should have been suppressed because the warrant authorizing the search was not supported by probable cause. Next, he urges that the district court should have conducted a *Franks* hearing to assess whether police officers knowingly or recklessly submitted false information in support of the warrant application. Finally, he contends that the court committed reversible error by refusing to give a requested limiting instruction about his prior felony conviction. Robinson's first two arguments are unavailing, but because the district court erred by failing to give a proper limiting instruction and that error was not harmless, his conviction must be vacated.

**I**

Robinson came to the attention of Chicago police officers through a tip provided by an anonymous informant, referred to in court filings only as "John / Jane Doe." (We will use the masculine pronoun for convenience.) According to the search warrant complaint, Doe and an individual named "Tookie" had known one another for

approximately eight months. In September 2010, Doe said that he bought marijuana from Tookie approximately one dozen times, with each sale occurring inside Tookie's first-floor apartment at 1453 S. Springfield. During the final transaction, which occurred on September 30, 2010, Doe noticed that Tookie had several more large bags of marijuana on a bookshelf in the hallway. In order to confirm that the leafy green substance Tookie provided was, in fact, marijuana (and perhaps for his own recreation), Doe smoked some of the goods purchased that day before talking to police officers.

Later that afternoon, City of Chicago police officer Griselda Elizondo took Doe past 1453 S. Springfield in a police vehicle. Doe confirmed that this was the apartment building where Doe purchased marijuana from Tookie. Elizondo then showed Doe photographs from a Chicago police database, and Doe identified a picture of the defendant, known by Chicago police to use the nickname "Tookie," as his marijuana-selling acquaintance. As explained in greater depth below, however, the precise method by which this identification took place is unclear from the record, and such details are critical in assessing the probative value of Doe's identification of Robinson.

Doe and Elizondo then appeared before a judge of the Circuit Court of Cook County, making themselves available for questioning and reciting the facts summarized above in a sworn complaint. No transcript of this proceeding appears in the record, and there is no indica-

tion that the court asked Doe any questions. Rather, the judge found that the complaint "state[d] sufficient facts to show probable cause" and issued a search warrant for Harvey Robinson, a.k.a. "Tookie," and the first-floor apartment at 1453 S. Springfield.

Shortly before 6:00 the next morning, nine or ten Chicago police officers conducted the planned search. Present at the time were Robinson, his grandmother (who opened the door for the police), his uncle and aunt, and his aunt's boyfriend. Sergeant Ronald Blas, the "search team supervisor," testified that he was the last police officer to enter the premises. Apparently, he was the *first* to notice a large silver revolver (a .44-caliber Ruger Super Redhawk) lying on top of a laundry basket immediately next to the front door (see photograph, *post* at 19). After noticing the gun, Blas walked over to Robinson, who had been asleep on a sofa in the dining room, read Robinson his *Miranda* rights, and asked Robinson "if there was anything in the residence that shouldn't be [t]here." According to Blas, Robinson answered either, "Yes, that's my gun," or "The gun that's in the laundry basket."

Robinson filed a pre-trial motion seeking to suppress the gun. The court indicated that there likely was probable cause supporting the search warrant, though it stopped short of making such a determination. Instead, it held that suppression was improper because the officers were entitled to rely on the warrant in good faith.

After the early morning search, Robinson was taken to a nearby police station, where he was interrogated by Elizondo and another Chicago police officer, Nina Moore. At trial, Moore and Elizondo both testified that Elizondo advised Robinson of his *Miranda* rights a second time, after which Robinson reconfirmed that the gun belonged to him. The officers recalled that Robinson stated that he purchased the gun several months earlier after overhearing two people discussing the weapon at a gas station near the intersection of West 111th and South State Streets. Robinson (they continued) admitted that he bought the gun for $200 from the owner inside a nearby Wendy's restaurant soon after.

Robinson's wife and grandmother testified for the defense. Both stated that they had never seen Robinson with a gun, and that they did not believe that the recovered revolver was his. Robinson's grandmother also testified that her daughter's boyfriend, who was staying in the apartment at the time of the search, had a criminal history. On cross-examination, the government elicited some minor concessions from the witnesses: Robinson's wife acknowledged that Robinson used to hang out on Chicago's South Side, in the general vicinity of W. 111th St. and S. State St., and Robinson's grandmother confirmed that she heard one of the officers announce during the search that he had discovered a gun. Robinson did not testify.

Before closing arguments, the parties agreed on the following jury instruction, which was modeled on Seventh Circuit Pattern Instruction 3.04, addressing

Robinson's stipulation that he had a prior felony conviction:

> You have heard evidence that prior to October 1, 2010, defendant Harvey Robinson was convicted of a felony offense. You may consider this conviction on the question of whether the government has proved that, prior to October 1, 2010, the defendant had been convicted of a crime that was punishable by a term of imprisonment of more than one year. You should consider this evidence only for this limited purpose.

When the court instructed the jury orally, however, it left off the final sentence ("You should consider this evidence only for this purpose."). Both Robinson and the government immediately flagged the omission, and Robinson urged the court to recall the jury to give the complete limiting instruction orally. The court originally explained that it failed to read the final sentence because it thought the limiting instruction was proper only if Robinson had taken the stand in his own defense. Apparently reconsidering this position, the court then expressed concern that recalling the jury would draw undue attention to a single instruction. Ultimately the court refused Robinson's request, but it emphasized that the jury would receive a complete set of the written instructions as they deliberated.

The jury met for almost five hours before asking to adjourn for the day. The court granted this request and instructed the jury to "reread all instructions" before they resumed their work. On the next day of delibera-

tions, the jury met for another five hours, at which point they signaled that they were having trouble reaching consensus. Again, the court told the jurors to "reread all instructions and continue to deliberate." About an hour later, the jury returned a verdict of guilty. Robinson was sentenced to ten years in prison.

## II

We turn first to Robinson's argument that the gun should have been suppressed because it was seized pursuant to a search warrant that was not supported by probable cause. We give no special weight to the district court's decision in assessing whether the facts add up to probable cause, but we do afford "great deference" to the conclusion of the judge who issued the warrant. *United States v. Carson*, 582 F.3d 827, 831 (7th Cir. 2009) (citing *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008)).

An issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the court], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Where, as here, an informant supplies the information contained in the affidavit, several factors inform our analysis: first, "the extent to which police have corroborated the informant's statements"; second, "the degree to which the informant has acquired knowl-

edge of the events through firsthand observation"; third, "the amount of detail in the affidavit"; fourth, "the interval between the time of events that gave rise to the need for a search warrant and that of the police officer's application for the warrant"; fifth, "whether the informant testified at the probable cause hearing." *Carson*, 582 F.3d at 832 (citations omitted).

In challenging the issuing judge's finding of probable cause, Robinson emphasizes that the warrant application contains no indication that "John / Jane Doe" had provided credible tips to police in the past, or that Elizondo had reason to believe that Doe was a reliable source of information. Indeed, it is unclear whether Elizondo knew of the informant at all before October 30, 2010, and the affidavit does not explain why Doe saw fit to give such self-incriminating information to Chicago police that afternoon. Under the *Aguilar-Spinelli* framework that guided probable cause determinations before *Gates*, these omissions might have doomed the warrant, since the "veracity" of anonymous tips needed to be supported by some assurance that the tip was credible and reliable. See *Gates*, 462 U.S. at 229 n.4. Although these considerations remain "highly relevant" under the more flexible "totality-of-the-circumstances" approach endorsed in *Gates*, they no longer dictate a finding that the warrant lacked probable cause. *Id.* at 230.

The government points to other information contained in the affidavit that supports the issuing magistrate's probable cause finding. For example, the basis of Doe's knowledge was well developed. Doe provided

a first-hand account of purchasing specific quantities of marijuana from Robinson and described the interior of Robinson's apartment in detail. Relatively little time elapsed between the events described in the affidavit and the officer's appearance before a magistrate, and Doe personally appeared before the Cook County judge with Elizondo, giving the issuing magistrate an opportunity "to evaluate the informant's knowledge, demeanor, and sincerity." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008).

Less convincing is the government's contention that police officers "corroborated" Doe's account. Taking Doe past 1453 S. Springfield gave police officers some limited amount of additional information—it would have severely undermined Doe's credibility, for instance, if Tookie's residence turned out to be a delicatessen—but it sheds little light on the central question whether marijuana was being trafficked at the premises. See *United States v. Dismuke*, 593 F.3d 582, 587-88 (7th Cir. 2010) ("[The officer]'s other efforts corroborated only [the defendant]'s identity and the fact that the informant had correctly identified [the defendant]'s residence. Accuracy on these innocent facts is important but does not directly bolster the informant's claim that [the defendant] illegally possessed guns at his home.").

Doe's identification of a photograph of Robinson from a police database, although superficially compelling evidence of corroboration (since police officers knew Robinson used the nickname "Tookie"), is, on closer examination, also of minimal utility. If Doe selected

Robinson from a group of photographs depicting several other persons *not* nicknamed "Tookie," the identification would have had some limited probative value, because it would suggest that Doe truly knew someone by this name (and that Robinson was likely he). The government concedes, however, that Doe did not select Robinson from a proper photographic lineup. Rather, the record suggests that Elizondo may simply have shown Doe photographs of several men already known to Chicago police as "Tookie." Doe made his selection from that array. In other words, Elizondo gave Doe a multiple-choice exam with no wrong answers: any selection made by Doe would have yielded a suitable "Tookie" whose name could then be entered into a warrant application. See National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* 29 (1999) ("fair composition" of a lineup requires a minimum of five "fillers" per identification procedure). Without some *independent* link between the selected photograph and the marijuana-dealing protagonist of Doe's story (*e.g.*, a database entry listing 1453 S. Springfield as a known address of the pictured "Harvey Robinson, a.k.a., 'Tookie'"), such an identification corroborates nothing.

Like the district court, however, we need not decide whether there was sufficient evidence to support the issuance of the search warrant, because the Fourth Amendment's exclusionary rule does not bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is later held to be defective. *United States v. Leon*, 468 U.S. 897, 905 (1984). We review *de novo* the district court's finding that the

"good-faith exception" announced in *Leon* applies to a particular warrant. *United States v. Miller*, 673 F.3d 688, 693 (7th Cir. 2012).

Robinson argues that the good-faith exception does not apply here because "the warrant was so lacking in indicia of probable cause that the police officers' belief in its validity was objectively unreasonable." See *Leon*, 468 U.S. at 923. We rejected a similar argument in *Miller*, where the defendant urged that police officers' failure to corroborate information provided by a confidential source rendered a warrant "so facially deficient that an officer could not reasonably rely on it." 673 F.3d at 693. There, a confidential informant provided a detailed, recent, firsthand account (likely against the informant's penal interest) that there was cocaine within the defendant's residence, and appeared before the issuing judge to swear that the affidavit was true. A neutral, detached magistrate issued a warrant based on this information. *Id.* at 693-94. Without deciding whether the warrant was supported by probable cause, this court held that "a reasonable officer might rely on the judge's issuance of a warrant based on [such an affidavit]" in good faith. *Id.* at 694. Here, we have a similarly detailed, recent, firsthand account of alleged wrongdoing that was likely self-incriminating; the informant swore to this statement before an issuing magistrate; and police officers made at least some minimal attempts to corroborate Doe's allegations. Because this warrant was not "so lacking in indicia of probable cause" that reliance on its validity was objectively unrea-

sonable, the district court correctly denied Robinson's motion to suppress.

## III

Robinson next argues that the trial court erred in refusing to hold a *Franks* hearing to assess the truthfulness of the statements in the warrant application. "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978). *Leon*'s good-faith exception "does not preclude inquiry into the knowing or reckless falsity of the affidavit on which [an otherwise valid finding of probable cause] was based." 468 U.S. at 914. We review the district court's denial of Robinson's request for a *Franks* hearing for clear error. *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013).

Robinson's preliminary showing consisted of sworn declarations from Robinson and his wife that Robinson was not at 1453 S. Springfield before 8:00 p.m. on September 30, 2010; this would make it impossible for Robinson to have sold marijuana to Doe at that address earlier in the day, as Doe alleged. Robinson acknowledges, however, that the relevant inquiry is not whether Doe provided false information to police

officers or the court, but whether Elizondo "acted reck-lessly because [s]he seriously doubted or had obvious reason to doubt the truth of the allegations" in the search warrant application. *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). Robinson does not argue that Doe was acting as a "government agent" when Doe appeared before the court. See *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994). Instead, Robinson argues that police officers acted recklessly because they failed to do more to corroborate Doe's account.

The district court did not commit clear error in con-cluding that this showing was not enough to call for a *Franks* hearing. That is so even though the Chicago police could have done more to verify Doe's account, and their failure to treat it with greater skepticism may have been negligent. But even accepting Robinson's declarations as true, there is no evidence that the police officers had obvious reason to doubt that Doe had purchased marijuana from someone named Tookie earlier that day. Without more, Robinson has not made a "substantial preliminary showing" that officers acted "with reckless disregard for the truth."

Robinson also invokes the law-of-the-case doctrine, arguing that the district court was obliged to hold a *Franks* hearing because a different district judge to whom the case originally was assigned found that Robinson had made a sufficient threshold showing. While, as a general matter, courts "should be loathe" to revisit prior decisions of their own or coordinate courts, *Christianson v. Colt Indus. Operating Corp.*, 586 U.S. 800,

817 (1988), an "[a]ctual decision of an issue is required to establish the law of the case," 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4478 (3d ed. 2005). Even if it can be argued that the original judge made "an actual decision of an issue" in determining that Robinson had made a "substantial preliminary showing," the law-of-the-case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messinger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.). The court did not err in reconsidering the question. It afforded both parties an opportunity to reargue their positions, and only then did it decide not to conduct a hearing.

**IV**

After closing arguments, the court read aloud the previously agreed-upon jury instructions. One of these instructions was a standard limiting instruction addressing Robinson's stipulation that he had a prior felony conviction. As the written instruction (correctly) noted, the jury could consider this stipulation in its deliberations, but only for the limited purpose of assessing whether Robinson was a convicted felon, an element of a Section 922(g)(1) offense. See FED. R. EVID. 105, 404. When the court read the instruction aloud, however, it decided to omit the critical admonition that the "jury should consider this evidence only for this limited purpose."

The oral jury instructions here were not just incomplete, as the government argues, but inaccurate. Before bringing the jury's attention to Robinson's criminal history, the court reminded the jurors of their duty:

> to decide the facts from the evidence in the case . . . . The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations. A stipulation is an agreement between both sides that certain facts are true . . . . In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this 'inference.' A jury is allowed to make reasonable inferences . . . based on the evidence in the case.

These are standard and appropriate instructions in most contexts. But the rules of evidence often demand some refinement. Without an additional instruction to consider the stipulation only for the limited purpose of determining whether Robinson was a convicted felon, this charge communicated to jurors that they were permitted, and perhaps even obliged, to consider the stipulation for the purpose of determining whether Robinson possessed the firearm. A lay juror could infer that a convicted felon is more likely to carry a dangerous weapon than someone without a track record of criminal wrongdoing. This inference, however, is precisely what Federal Rule of Evidence 404(b) forbids.

The complete and accurate set of written instructions given to the jury did not cure this error. The government highlights the written instructions in arguing that

the jury was not misled if we evaluate "the instructions as a whole," *United States v. Javell*, 695 F.3d 707, 714 (7th Cir. 2012), but this requires us to make two assumptions: (1) that the jury noticed that the 28-page document was inconsistent with the oral instructions they had heard, and (2) that the jury decided to resolve this conflict in favor of the written instructions. Although the court twice told the jurors to "reread all instructions," nothing assures us that these two assumptions are valid here. Our criminal justice system has relied on oral jury instructions since its inception, and while there is ample evidence that the increasingly common use of supplementary written instructions can help jurors understand difficult legal concepts, see Nancy R. Marder, *Bringing Jury Instructions Into the Twenty-First Century*, 81 NOTRE DAME L. REV. 449, 490-510 (2006), a trial judge commits error if she fails to "read aloud jury instructions in their entirety," *United States v. Perry*, 479 F.3d 885, 893 (D.C. Cir. 2007); accord *Guam v. Marquez*, 963 F.2d 1311, 1314-15 (9th Cir. 1992), *United States v. Noble*, 155 F.2d 315, 318 (3d Cir. 1946).

The more difficult question is whether this mistake should be disregarded as harmless error because it "does not affect substantial rights." See FED. R. CRIM. P. 52(a). The "discrimination [harmless error review] requires is one of judgment transcending confinement by formula or precise rule." *Kotteakos v. United States*, 328 U.S. 750, 761 (1946). Because "it is not the appellate court's function to determine guilt or innocence," our inquiry cannot stop with the question "whether there was enough to support the result, apart from the phase

affected by the error." *Id.* at 763, 765. Rather, we examine the effect of the error on the decisionmaking process as a whole, asking "whether the error itself had substantial influence," *id.* at 765; see also *Miller*, 673 F.3d at 700. Generally speaking, a finding of harmlessness is appropriate only if an appellate court can say "with fair assurance" that the judgment was not "substantially swayed by the error." *Kotteakos*, 328 U.S. at 765. The burden of demonstrating harmlessness rests with the government. See *O'Neal v. McAninch*, 513 U.S. 432, 438-39 (1995); *United States v. Olano*, 507 U.S. 725, 734 (1993).

The government argues that the jury-instruction error was harmless based on the strength of the other evidence against Robinson. It relies primarily on the testimony of Sergeant Blas, a 21-year veteran of the Chicago police department and the supervisor of the search team, who said that Robinson admitted that the revolver was his at the time of the search; and the testimony of Elizondo and Moore, who both said that Robinson provided a second confession during a subsequent interrogation. These statements were included in an "Incident Report" authored by Moore later that day. The sole issue at trial was relatively simple: did the gun really belong to Robinson? We agree with the government that, if the jury believed the testimony of these three witnesses, the case against Robinson was open and shut.

Without the testimony of these three officers, however, there was no evidence (*e.g.*, fingerprints, witness

statements) tying Robinson to the revolver, and so Robinson's defense strategy focused on attacking the officers' credibility. Robinson argued that the Chicago police expected to find evidence of a significant drug-dealing operation at 1453 S. Springfield, consistent with the information provided by Doe in the warrant affidavit, and they were disappointed to discover only negligible quantities of marijuana. Authorities thought that Robinson could still lead them to other persons involved in the drug trade, however, and they were hoping to leverage the bogus firearm accusation to pressure Robinson into "cooperating" with these efforts. Robinson's opening and closing arguments suggested two different scenarios consistent with this theory: (1) the gun was planted by Chicago police; (2) the gun was not planted, but belonged to someone else inside the apartment, and the Chicago police fabricated Robinson's two purported confessions to encourage him to talk.

Robinson developed the first possibility through cross-examination of Blas. According to Blas, the nine or ten members of the search team entered the apartment in an orderly fashion, without any need for force, since Robinson's grandmother opened the door. Blas, the search supervisor, was the last to enter. Once across the threshold, Blas said that he observed a laundry basket just to his right, where he spotted a large, shiny revolver resting atop the clothes. We include a photograph of the gun, taken before police officers moved any of the evidence, to highlight the gun's conspicuous placement. To credit Blas's testimony, the jury would have to believe that eight or nine trained

Chicago police officers, conducting a search for evidence of criminal wrongdoing, passed within inches of a plainly visible gun without noticing it. Robinson urged that this was implausible.



After calling for another officer to take control of the gun, Blas testified that he then read *Miranda* warnings to Robinson (who was detained on the sofa in the next room) and asked him "if there was anything in the residence that shouldn't be here." According to Blas, Robinson replied, "'Yes, that's my gun,' or 'The gun that's in the laundry basket.'" (We note that the latter reply implies only knowledge of the gun's presence, not necessarily possession, though the defense did not advance this argument to the jury.) Although there

were eight or nine other police officers in the apartment at this time, and Moore testified that she was able to hear Sergeant Blas reading a *Miranda* warning, no other witnesses testified that they overheard Robinson's inculpatory statement.

Robinson also attacked the credibility of Moore and Elizondo, who testified that Robinson again acknowledged that he owned the gun during the later station-house interview. Despite the fact that officers had just conducted a search expecting to find marijuana—and, indeed, *had* found a tiny bit of marijuana—both officers testified that they were uninterested in Robinson's "cooperation" in ongoing drug investigations. Indeed, Elizondo denied asking Robinson about *anything* other than the gun during the interview:

> Q: What do you recall saying to Mr. Robinson in the interview room?
>
> A: Where he had purchased the gun, or where—where he had gotten the gun from.
>
> Q: That's it?
>
> A: Yes.
>
> Q: That's the only thing you said the whole time you were sitting in the interview room?
>
> A: I asked him that question and then he related the information that's on my report.

Neither officer retained notes from the interrogation, asked Robinson to provide a written confession, made an audio recording, or sought Robinson's signature or

initials to confirm their summary of Robinson's statements. Moore and Elizondo also seemed shaky on the particulars of the search: although both officers remembered certain details that were useful to the government's case, they struggled to remember other pertinent information solicited by the defense, such as the layout of the apartment or the number of other people present at the time of the search.

In an effort to bolster Moore and Elizondo's account, the government highlighted the fact that the Incident Report mentioned businesses (a gas station and a Wendy's restaurant) near the intersection where Robinson purportedly admitted buying the gun. The government argued that this served as proof that the officers' accounts were genuine, since Moore and Elizondo testified that they were unfamiliar with the area at the time of the search, and photographs taken after the interrogation confirmed the presence of a gas station and a Wendy's restaurant at this location. If police officers were intent on manufacturing a false statement, however, they could have included certain details to make the statement seem more legitimate. Arguing this theory, Robinson elicited from Moore that the officers had internet access at the stationhouse where the interview took place, allowing them to pull up a picture of the intersection in question. See http://goo.gl/maps/YGHty (last visited July 29, 2013). And it is at least conceivable that other information already known to Chicago police—arrest records, gang affiliations, other database entries—linked Robinson to this area.

We indulge these hypotheticals not because we are persuaded that the police witnesses testified dishonestly: it is not our role to "become in effect a second jury to determine whether the defendant is guilty." *Neder v. United States*, 527 U.S. 1, 19 (1990) (quoting R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 21 (1980)). Still, we note that deliberations lasted for nearly 11 hours before the jury returned its guilty verdict, a result that was all but inescapable if the jury credited the government's witnesses. Particularly where there is reason to think that the jury had difficulty in reaching its verdict, we must tread cautiously before concluding that an error was harmless. *Kotteakos*, 328 U.S. at 764 ("[Harmless error review] must take account of what the error meant to the [jury], not singled out and standing alone, but in relation to all else that happened.").

With this record in mind, we now turn to weighing the impact of the trial court's error here. On the one hand, the government never argued to the jury that it should consider Robinson's prior felony conviction for an improper purpose. This diminishes to some extent the risk that the prohibited inference (that Robinson was more likely to possess the gun because he was a convicted felon) entered into the jury's deliberations. On the other hand, there are well-recognized dangers inherent in allowing juries to consider any evidence of a defendant's prior trouble with the law in subsequent criminal proceedings:

> The inquiry is not rejected because character is ir-
> relevant; on the contrary, it is said to weigh too

much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (internal citations omitted); see also *United States v. Hope*, 906 F.2d 254, 264 (7th Cir. 1990) ("The danger inherent in submitting evidence of a prior conviction to a jury is self-evident [and] exist[s] with or without [a] stipulation."). This helps explain why the evidentiary rule governing limiting instructions is written in mandatory terms, providing that "the court, on timely request, *must* restrict the evidence to its proper scope and instruct the jury accordingly." FED. R. EVID. 105 (emphasis added).

In the end, we cannot say "with fair assurance" that the judgment was not substantially swayed by the trial court's error. *Kotteakos*, 328 U.S. at 765. Robinson's defense hinged on convincing the jury that several police officers fabricated his confessions, a theory that was not implausible. It may be that Robinson's criminal history played no role in deliberations, but it is also possible that Robinson's criminal history helped persuade the jury that the police officers were telling the truth about the provenance of the revolver and Robinson's confessions. The government has not met its burden of establishing that this was not what occurred.

"[I]n the face of the misdirection and in the circumstances of this case, we cannot assume that the lay triers of fact were so well informed upon the law or that they disregarded the permission expressly given" to draw the improper inference. *Id.* at 769. The error was not harmless.

## V

Robinson also raises two additional issues: he argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment by limiting certain lines of cross-examination of police witnesses, and that the district court abused its discretion in failing to declare a mistrial as jury deliberations entered their ninth hour. Since these issues are unlikely to recur in precisely the same manner on remand, we refrain from addressing them.

We REVERSE the district court's judgment and REMAND for a new trial.