NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 12, 2014
Decided March 12, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 13-2599

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 12-CR-110 |
| TARA A. THOUSAND, *Defendant-Appellant.* | Lynn Adelman, *Judge*. |

**O R D E R**

An investigation of a series of bank robberies in Dane County, Wisconsin, led to Tara Thousand. Surveillance cameras at several of the robbed banks captured the image of a suspect resembling Thousand's then-boyfriend, Michael Benike, climbing into a silver Toyota Corolla with a sunroof. Thousand was one of 49 registered owners of that make and model car in Dane County. After authorities interviewed Thousand and Benike at a motel, a federal prosecutor applied for an order to obtain call records from Thousand's and Benike's wireless carriers, *see* 18 U.S.C. §§ 2703(c)(1)(B), (d), 3122, 3123, to determine if their phones were used near the banks around the times of the robberies. A magistrate judge issued the order, which allowed the investigators to obtain an engineering map showing the location of all cell towers that relayed signals from these

suspects' phones during the period beginning on the date of the first robbery and ending 60 days from the date of the order.

Authorities later obtained warrants to search Thousand's home, car, and person. FBI special agents Joseph Lavelle and Josh Mayers stopped Thousand on a roadway around six in the morning on July 13, 2012, to execute the warrant for her car. The agents told her that she was not under arrest and asked that she speak with them at their office. Thousand agreed and rode in the rear seat of Mayers's car. She sat with the agents in a large conference room and, after *Miranda* warnings, she signed her name below a preprinted statement on an FBI consent form saying, "I am willing to answer questions without a lawyer present." During the interview Thousand explained that when the agents stopped her she was en route to a medical clinic that would be closing at 10:30 a.m. to receive methadone, which she was taking while trying to overcome a heroin addiction. During the interview she recalled details about the robberies and identified Benike in surveillance stills. When the interview ended the agents placed Thousand under arrest and escorted her to the methadone clinic, where she received her dose a little after nine in the morning.

Thousand entered a conditional guilty plea to one count of bank robbery, *see* 18 U.S.C. § 2113(a), reserving the right to challenge on appeal any adverse decision on her motions to suppress, which were then pending before the district judge. Thousand was seeking to suppress the records from her wireless carrier (and all derivative evidence), particularly the location data gleaned from cell-tower records, and requested a *Franks* hearing to attack the truthfulness of information included in the prosecutor's § 2703(d) application. *See Franks v. Delaware,* 438 U.S. 154, 155–56 (1978). She also sought to suppress her confession on the grounds that the FBI agents had coerced her statements by telling her that she would miss her methadone appointment if they had to wait for counsel to arrive.

Before Thousand pleaded guilty, a magistrate judge had already conducted an evidentiary hearing on her motions and recommended that the district judge deny them. At the hearing Thousand had testified, as did Agents Lavelle and Mayers. Thousand testified that she asked during the traffic stop if she could go to the clinic before being interviewed but was told no. After the agents began questioning her about the robberies, Thousand testified, she said, twice, "I think I need an attorney." After that, Thousand continued, the agents had left the conference room for about 20 minutes before having her sign another waiver of counsel and resuming the interrogation. Thousand explained that she inquired again if she would make her appointment, and

was told that she might not arrive at the clinic before closing time if she waited for an attorney to arrive. Thousand added that the thought of missing her appointment had made her antsy, panicky, and unfocused. In contrast, both agents testified that Thousand actually had said, "I think I need a lawyer, I don't know, but I want to cooperate and talk." Agent Mayers denied telling Thousand that she risked missing her appointment if she invoked her right to counsel and testified that he assured her numerous times that they would take her to the clinic before it closed, no matter what. Both agents agreed that Thousand appeared relaxed during the interview and showed no physical signs of withdrawal. In denying Thousand's motions, the district judge credited the agents over the defendant, as the magistrate judge also had done.

At sentencing the district court calculated a total offense level of 18 and criminal history category of I, yielding a guidelines imprisonment range of 27 to 33 months. The offense level includes a 2-level upward adjustment for making a death threat, *see* U.S.S.G. § 2B3.1(b)(2)(F), based on a note Benike handed a teller saying, "I have a gun," and a 3-level decrease for Thousand's minimal role in the offense, *see id.* § 3B1.2. The district court imposed a below-guidelines sentence of six months' imprisonment and three years' supervised release.

Thousand filed a notice of appeal, but her appointed lawyer asserts that the appeal is frivolous and moves to withdraw under *Anders v. California,* 386 U.S. 738, 744 (1967). Thousand has not responded to counsel's submission. *See* CIR. R. 51(b). We limit our review to the potential issues identified in counsel's facially adequate brief. *See United States v. Schuh,* 289 F.3d 968, 973–74 (7th Cir. 2002). Thousand does not wish to challenge her guilty plea, and thus counsel appropriately omits discussion about the adequacy of the plea colloquy and the voluntariness of the plea. *See United States v. Knox,* 287 F.3d 667, 671–72 (7th Cir. 2002).

Counsel first considers whether Thousand could argue that the district court erred in ruling on her motion to suppress the telephone records without conducting a *Franks* hearing. A *Franks* hearing is required only when the defendant "makes a substantial preliminary showing that authorities deliberately or recklessly made material misrepresentations" in an application for a search warrant. *United States v. Currie,* 739 F.3d 960, 963 (7th Cir. 2014). Yet the government did not use a search warrant to obtain phone records in this case; rather, the government secured those records using an order authorized by the Stored Communications Act, Pub. L. No. 99-508, 100 Stat. 1861, tit. II, § 201 (codified as amended at 18 U.S.C. §§ 2701 to 2712), and if there was error in the procuring of the records under the statute, the

exclusionary rule is not a remedy, *see* 18 U.S.C. §§ 2707 to 2708; *United States v. Chaparro-Alcantara*, 226 F.3d 616, 621 (7th Cir. 2000); *United States v. Condon*, 170 F.3d 687, 689 (7th Cir. 1999); *United States v. Clenney*, 631 F.3d 658, 666–67 (4th Cir. 2011); *United States v. Perrine*, 518 F.3d 1196, 1201–02 (10th Cir. 2008). More importantly, *Franks* cannot be relevant unless the Fourth Amendment is relevant, and that question turns on whether the defendant has, as counsel assumes but does not assert, a legitimate expectation of privacy in her carrier's records and the cell-tower data. *See United States v. Scott,* 731 F.3d 659, 663 (7th Cir. 2013); *United States v. Stefonek,* 179 F.3d 1030, 1035 (7th Cir. 1999).

Before the days of mobile phones, the Supreme Court held that a person has no legitimate expectation of privacy in a phone company's records of numbers dialed on a telephone, and thus a defendant cannot invoke the Fourth Amendment when the police install a pen register without a warrant. *Smith v. Maryland,* 442 U.S. 735, 745–46 (1979); *see United States v. Kramer,* 711 F.2d 789, 792 (7th Cir. 1983). After *Smith* was decided, Congress enacted the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848 (1986), which *statutorily* limits the ability of law enforcement to obtain certain phone records from telecommunication carriers. *See* Robert A. Pikowsky, *An Overview of the Law of Electronic Surveillance Post September 11*, 2001, 94 Law Libr. J. 601, 608 (2002). The Stored Communications Act is part of that legislation and allows authorities to obtain a court order compelling disclosure of noncontent records, including subscriber information and connection data, that are "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(c), (d); *see* Orin S. Kerr, *Internet Surveillance Law after the USA Patriot Act: The Big Brother that Isn't*, 97 NW. U. L. Rev. 607, 611 (2003). A showing of probable cause is not required. *See In re Application of U.S. for Order Pursuant to 18 U.S.C. Section 2703(d),* 707 F.3d 283, 287 (4th Cir. 2013); *In re Application of U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't,* 620 F.3d 304, 315 (3d Cir. 2010). Authorities regularly invoke the Stored Communications Act during criminal investigations to obtain court orders for information relating to cell-site tower locations. *See Am. Civil Liberties Union v. U.S. Dep't of Justice,* 655 F.3d 1, 3–4 (D.C. Cir. 2011).

We have yet to address whether, notwithstanding *Smith,* cell-tower information that telecommunication carriers collect is protected by the Fourth Amendment. Recently the Fifth Circuit concluded that Supreme Court precedent "does not recognize a situation where a conventional order for a third party's voluntarily created business records transforms into a Fourth Amendment search or seizure," and thus the court rejected the contention that using court orders available through the Stored Communications Act to collect historical cell-tower data without a showing of probable

cause is unconstitutional. *In re Application of U.S. for Historical Cell Site Data,* 724 F.3d 600, 614–15 (5th Cir. 2013); *see also In re Application of U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't,* 620 F.3d at 313–15 (concluding that, although § 2703(d) does not require authorities to show probable cause to obtain historical cell-tower data, judges have authority in particular cases to reject § 2703(d) applications and instead require use of search warrant establishing probable cause); *United States v. Forest,* 355 F.3d 942, 950–52 (6th Cir. 2004) (concluding that DEA use of cell-site data was not a "search" under Fourth Amendment because authorities tracked defendant's movements along public highways), *vacated on other grounds sub. nom. Garner v. United States,* 543 U.S. 1100 (2005). We have not found any federal appellate decision accepting Thousand's premise that obtaining cell-site data from telecommunications companies—under any factual scenario—raises a concern under the Fourth Amendment.

Like the district court, we would have no reason in this case to express an opinion about whether a probable-cause standard should govern § 2703(d) applications seeking cell-tower data that will disclose a subscriber's location at a particular time. In her motion to suppress, Thousand never asserted that the prosecutor's application for a § 2703(d) order, if taken at face value, does not establish probable cause. Rather, her only contention was that a *Franks* hearing was necessary to explore what Thousand characterized as a material misstatement in the application; without that misstatement, Thousand argued, the court would not have granted the § 2703(d) application. The district court rejected that contention with the explanation that, to the extent that a showing of probable cause was necessary, the affidavit would have sufficed without the disputed information. We agree with appellate counsel that a challenge to the district court's conclusion would be frivolous.

To obtain a *Franks* hearing, the allegedly false statement must be material "in the sense that it was necessary to find probable cause." *United States v. Schultz,* 586 F.3d 526, 531 (7th Cir. 2009); *see United States v. Robinson,* 724 F.3d 878, 886 (7th Cir. 2013). Thousand had attacked the § 2703(d) application because the prosecutor erroneously stated that she had a conviction for possessing marijuana. But the application also disclosed that surveillance video from the banks showed the robber making his getaway in a silver Toyota Corolla with a sun roof; 49 vehicles registered in Dane County, Wisconsin, matched that description; Thousand had been observed driving a silver 2004 Toyota Corolla with a sunroof; Benike could not drive because his license had been revoked; investigators had not ruled out Thousand and Benike as suspects after interviewing them; and Benike's physical appearance matched the robber seen in

the banks' surveillance videos. So whether or not Thousand had a drug conviction, the application accurately conveyed that she owned a car matching the images captured by video surveillance and was dating a man fitting the description of the robber, which together add up to probable cause to believe that the wireless records would be incriminating. *See United States v. Hicks*, 650 F.3d 1058, 1065 (7th Cir. 2011).

Appellate counsel next discusses two possible arguments concerning Thousand's motion to suppress her confession. The first concerns her assertion that the FBI agents did not terminate the questioning after she mentioned a lawyer, and the other is whether the agents coerced her statements by telling her that she would miss her methadone dose if she insisted on waiting for counsel. For Thousand to be able to cast a nonfrivolous argument based on the interrogation, however, she would need to convince us that the district court clearly erred in crediting the agents' testimony over hers. Given the special deference we accord credibility determinations made by district courts, *United States v. Knope,* 655 F.3d 647, 651 (7th Cir. 2011); *United States v. Terry*, 572 F.3d 430, 434–35 (7th Cir. 2009), we also would evaluate the version of the interrogation given by the agents. And we agree with appellate counsel that their version would doom any argument contesting the denial of this motion to suppress.

Invoking the Fifth Amendment right to counsel requires an unambiguous request for a lawyer. *See Davis v. United States,* 512 U.S. 452, 459 (1994); *United States v. Martin,* 664 F.3d 684, 688 (7th Cir. 2011). If the request is equivocal, questioning need not end. *United States v. Wysinger,* 683 F.3d 784, 793 (7th Cir. 2012). Agent Lavelle testified that Thousand said, "I think I need a lawyer, I don't know, but I want to cooperate and talk." So we would evaluate whether that statement constitutes an unambiguous invocation of the right to counsel. But as counsel rightly points out, by immediately qualifying "I think I need a lawyer" with "I don't know," Thousand failed to express a "clear implication of a present desire to consult with counsel." *See Lord v. Duckworth,* 29 F.3d 1216, 1221 (7th Cir. 1994); *see also United States v. Hampton,* 675 F.3d 720, 727 (7th Cir. 2012) (noting that using "hedge" words like "but" when referring to counsel would lead a reasonable officer to understand only that suspect *might* want attorney present); *United States v. Buckley*, 4 F.3d 552, 558–59 (7th Cir. 1993) (concluding that stating "I don't know if I need an attorney" was insufficient to invoke right to counsel).

As for the alleged coercion, a confession is voluntary "if, under all the circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Carson,* 582 F.3d 827, 833 (7th Cir.

2009) (internal quotation marks and citation omitted). Factors we consider include the suspect's mental state and how drug use may have affected that state. *United States v. Vallar*, 635 F.3d 271, 282 (7th Cir. 2011). The agents repeatedly assured Thousand that, no matter what, she would be able to go to the clinic to receive methadone that day. They also testified that she exhibited no physical signs of withdrawal during the interview. And as appellate counsel points out, Thousand never contended that any other aspect of the interrogation coerced her confession. Because we would accept the agents' testimony as accurate, we necessarily would reject any assertion that they took advantage of Thousand's addiction and dependence on them to make her scheduled appointment, and so there would be no basis for Thousand to contest the denial of her motion to suppress her confession.

Counsel next questions whether Thousand could challenge the 2-level upward adjustment for making a threat of death, *see* U.S.S.G. § 2B3.1(b)(2)(F), or the district court's decision to limit the decrease for her role in the offense to 3 levels instead of 4, *see id.* § 3B1.2(b). At sentencing Thousand did not argue that Benike's note about having a gun was not an implied threat of death or that his note was not reasonably foreseeable; rather, she argued that she should not be held responsible for Benike's actions because she participated under duress. This contention was really an appeal to the district court's sentencing discretion and not an objection that applying the upward adjustment would lead to miscalculation of her offense level. *See United States v. Gonzalez*, 462 F.3d 754, 755 (7th Cir. 2006). Thus, we would review only for plain error an appellate claim that the court erred by applying § 2B3.1(b)(2)(F). *United States v. Corona-Gonzalez*, 628 F.3d 336, 340 (7th Cir. 2010). A defendant is responsible for the reasonably foreseeable acts of a co-defendant, U.S.S.G. § 1B1.3; *United States v. Zhaofa Wang*, 707 F.3d 911, 914–15 (7th Cir. 2013); *United States v. Smith*, 697 F.3d 625, 636 (7th Cir. 2012), and Thousand's admission that she saw Benike write the threatening note was enough for the court to apply the increase. Nor would we conclude that the court clearly erred by deciding that Thousand's role was not so insignificant as to make her a minimal participant. The guidelines define a minimal participant as someone with a "lack of knowledge or understanding of the scope and structure of the enterprise." U.S.S.G. § 3B1.2 cmt. n.4; *see United States v. Garcia*, 580 F.3d 528, 538 (7th Cir. 2009). The district court found that Thousand's role was limited to driving Benike to and from the vicinity of the banks and calling some of the banks to confirm their hours. The court acknowledged that her role was substantially smaller than Benike's, so she was entitled to a reduction, but only to three levels because she had a complete understanding of Benike's illegal activities. *See United States v. Scroggins*, 939 F.2d 416, 424 (7th Cir. 1991) (approving denial of minimal-role reduction for defendant in drug conspiracy who

understood scope of co-defendant's activities and allowed drug transactions to take place in his residence). Therefore, any argument that the court misapplied these two adjustments would be frivolous.

Lastly, counsel evaluates whether Thousand could challenge the reasonableness of her 6-month sentence and correctly concludes that any appellate claim would be frivolous. Thousand's below-guidelines sentence is presumed reasonable, *see Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Banas*, 712 F.3d 1006, 1012 (7th Cir. 2013), and we agree with counsel that the record presents no basis to set that presumption aside.

Accordingly, the motion to withdraw is GRANTED, and the appeal is DISMISSED.