# Illinois Official Reports

## Appellate Court

---

### *People v. Strickland*, 2019 IL App (1st) 161098

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM STRICKLAND, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-16-1098 |
| Filed<br>Modified upon<br>denial of rehearing | June 28, 2019<br><br>September 23, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-842401; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Christina Senger, Assistant State's Attorneys, of counsel), for the People. |

Panel               JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Griffin concurred in the judgment and opinion.

## OPINION

¶ 1      Defendant, William "Dashawn" Strickland,[1] along with his grandmother, Janet Strickland, were charged with multiple counts of first degree murder and solicitation of murder for his role in the death of his grandfather. Following a jury trial, defendant was convicted of first degree murder and was sentenced to 40 years' imprisonment. On appeal, defendant argues that the trial court erred when it failed to submit Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.17), the accomplice witness instruction, to the jury. In his supplemental brief, defendant argues that the State violated his fourth amendment right to be free from unreasonable searches when it obtained his cellular location information without a warrant and the trial court erred in denying his motion to suppress this evidence. For the following reasons, we affirm.

¶ 2                                 BACKGROUND

¶ 3      Prior to trial, defense counsel filed a motion to suppress cell site location information (CSLI) for Janet Strickland's cell phone, which defendant had before and during the commission of the offense. In the motion, defendant argued that he had a reasonable expectation of privacy over the information and the State's acquisition of this data without a search warrant or court order supported by probable cause violated his fourth amendment rights and the Illinois Constitution. The State responded that its acquisition of the CSLI was pursuant to a grand jury subpoena served by an agent of the grand jury, a Chicago police officer, and thus the records became part of discovery after the indictment. After hearing argument on the motion, the trial court denied defendant's motion without explanation.

¶ 4      At trial, Edward Cleveland testified that he was a retired medical transportation driver. Cleveland had been driving 72-year-old William Strickland,[2] the victim, to and from dialysis every Saturday for a year. Cleveland arrived at Strickland's home at 454 East 95th Street in Chicago at 3:28 a.m. on March 2, 2013, and parked the car. Cleveland heard several gunshots and saw Strickland collapsed in the gangway. He saw a young man about 5 feet, 9 inches tall, wearing a hoodie and baggy jeans, run out of the gangway and head west. He saw another young man who was about 6 feet tall, 160 pounds, wearing a hoodie, trying to take Strickland's bag away from him. This man ran north toward the alley. Cleveland got back into his car and drove around to see if he could locate the offenders, but he did not. He then got out of his car and went to check on Strickland and determined that he had been killed. He saw Janet Strickland, William's wife, standing by the side door of the house and told her to call 911. Cleveland spoke to the police when they arrived. Defendant arrived at the house sometime later.

---

[1]Defendant is the sole party to this appeal.

[2]Defendant and the victim share the same first and last name. For clarification purposes, we will refer to defendant as "defendant" or "Dashawn" and the victim as "victim" or "Strickland."

¶ 5        Chicago police officer Daniel Fava testified that he was on duty with his partner on March 2, 2013, and responded to a call of a person shot in the area of 454 East 95th Street. When he arrived, he saw Cleveland waving his arms at them. He also observed Strickland lying in the gangway outside the door to the residence. Strickland had sustained multiple gunshot wounds. There were shell casings and bullets on the ground near his body. Janet Strickland, Strickland's wife, was standing in the doorway to the gangway on the side of the house, crying.

¶ 6        Officer Fava spoke with Cleveland about the two possible offenders that fled the scene. Officer Fava searched the area but did not find anyone. Defendant arrived a short time later. Officer Fava stated that defendant was "stone faced" and "apathetic."

¶ 7        A forensic pathologist determined that the victim died as a result of multiple gunshot wounds to his body, including six gunshot wounds to his back.

¶ 8        Defendant's mother, and Strickland's daughter, Lesley, testified that she received a call from Janet sometime after 3 a.m. on March 2, 2013. Lesley drove from Milwaukee to Chicago, and when she arrived at her parent's house, she noticed that Janet appeared intoxicated and was not crying.

¶ 9        Lesley testified that Janet was spending money unusually, buying food and liquor for visitors, telling visitors to take furniture, and talking about how she wanted to redecorate the house. The following day, a 60-inch flat screen television and a television stand with a built-in fireplace and a refrigerator were delivered to the house. Lesley testified that Janet was on a fixed income and often asked to borrow money. On March 30, 2013, Janet went to a casino in Milwaukee.

¶ 10       Lesley learned that defendant had been arrested and visited defendant in jail on April 4, 2013. Defendant told Lesley that "she had it done," which Lesley took to mean that Janet had Strickland killed. Defendant told Lesley that Janet had asked him if he knew anybody. In her prior grand jury testimony, Lesley stated that defendant told her he had "met with a guy" named "Black" and that defendant "was there at 2 o'clock to pick up the guy, to set it up for the shooting." "Black" was later identified as Danny Armstrong. Defendant also told Lesley that Janet had bought him a car in exchange for his silence. In her prior grand jury testimony, Lesley stated that defendant said he met with Armstrong around 2 a.m. to discuss shooting the victim. Lesley asked defendant if that was why Janet bought him the car. Defendant said "yes."

¶ 11       While Lesley was visiting defendant in jail, defendant asked her to contact his girlfriend Lavetta Smith because he did not want her to testify. Lesley told defendant that his fingerprints were found on the gun. She did not know if this was true but was fishing for information from defendant. Defendant called Lesley several days later and told her that Janet had paid him to take the gun out of the house. Defendant also stated that his fingerprints were not on the gun and that he did not shoot the victim.

¶ 12       Lavetta Smith, defendant's girlfriend at the time of the murder, testified that, in March 2012, she was living with defendant, the victim, and Janet in the victim's home. Sometime before March 2, 2013, she overheard a conversation with defendant and Janet, where Janet said that she was going to poison the victim and defendant said he would go upstairs and kill him. Defendant and Janet began laughing. In February 2013, she heard another conversation between defendant and Janet about killing the victim. Defendant said that he needed a gun before the next day and would get it from Janet. The gun he was referring to belonged to the victim.

¶ 13    On February 28, 2013, Smith heard defendant tell Janet that "Black was playing," meaning that Armstrong did not want to kill the victim. Defendant then said he was "was gonna kill his grandfather himself." Janet and Smith told him not to. Defendant said he was "gonna do it anyway."

¶ 14    Smith had previously seen defendant with the victim's gun. He had been carrying it for a month prior to the murder. Defendant put the gun in a compartment under the passenger seat of the victim's car, which defendant would often drive. Smith identified the gun in open court.

¶ 15    On March 1, 2013, defendant drove Smith and Phillamena Stitts to a party, dropped them off, and left. Defendant did not have his own phone and borrowed Janet's when he went out. Defendant used Janet's phone to communicate with Smith while she was at the party. Defendant picked up Smith, Stitts, and another friend from the party. He dropped Stitts off at home and then went to another party. They left the party after about 15 minutes, dropped the friend off, and went back to Stitts's house. Smith fell asleep on the couch.

¶ 16    Defendant woke Smith up and said they were "fittin' to go, he was going to do this," which Smith understood to mean that he was going to "kill his grandpa." Defendant and Smith left Stitts's house and drove to the victim's home. They parked the car on the next block in the alley. Defendant was armed with the same gun Smith had previously identified in open court. Defendant told Smith to keep the doors unlocked and ran toward the alley. Smith locked the doors and fell asleep. She awoke to defendant knocking on the window. Defendant had a brown bag that looked full. He put the bag in the back seat and then drove back to Stitts's house.

¶ 17    When they arrived, defendant said he had to check in with Janet and used Stitts's phone to call her. Smith heard defendant say, "Is he dead?" Smith and defendant left Stitts's house and went back to the victim's house. Smith heard defendant ask Stitts "to put up" the gun for him.

¶ 18    After March 2, 2013, defendant began spending a lot of money. He bought Smith a tattoo, shoes, and earrings and bought himself a phone, shoes, and tattoos. Defendant also bought a used Pontiac Grand Prix. Neither Smith, Janet, nor defendant had a job.

¶ 19    On March 15, 2013, defendant and Smith went to Stitts's house for a party. When they arrived, Stitts brought out a black purse and handed it to defendant. Smith and defendant then went to Armstrong's house, and Armstrong got into the car. Defendant took some bullets out of the purse and handed them to Armstrong. Defendant also gave Armstrong something else from the purse, but Smith could not see what it was.

¶ 20    Smith was arrested for this offense and originally lied to the police because defendant and his family had threatened her family. After she told police what really happened, she was released from custody. She admitted that she had a contempt charge against her for failing to appear at trial. She did not want to testify but she was telling the truth.

¶ 21    Phillamena Stitts testified consistently with Smith about being picked up by defendant and Smith on the night of March 1, 2013, and going to several parties. Sometime after midnight on March 1, 2013, defendant dropped her off at her home, and she went to sleep. She awoke later to defendant knocking on her window. She opened the door and let defendant and Smith in. Defendant asked to use the phone. While he was on the phone, she heard defendant say, "Why can't I come home?" After he hung up, he said, "My granddaddy got shot." Smith and defendant then left.

¶ 22    Later that morning defendant and Smith came back to Stitts's house. Defendant asked her to hold his gun, and she agreed. Defendant took the gun, which was wrapped in a T-shirt, out

of his hoodie pocket and gave it to her. Stitts put the gun in a purse and put the purse in the basement closet. She identified the gun that defendant gave her in open court. Several days later, defendant sent her a message saying, "[i]f the detective asks you anything you don't know nothing."

¶ 23    On March 15, 2013, Smith and defendant came to Stitts's house. Defendant asked Stitts to get what she was holding for him. She went inside, got the purse, and gave it to defendant. Defendant put the purse in a compartment under the back seat.

¶ 24    Stitts also had a contempt charge pending against her for failing to appear in court. Those charges were withdrawn after her testimony.

¶ 25    Danny "Black" Armstrong testified that he knew defendant for about a year. During his trial testimony, Armstrong often stated that he did not remember facts and gave testimony contrary to his grand jury testimony. The State introduced portions of his grand jury testimony as substantive evidence.

¶ 26    In December 2012, defendant told Armstrong that his grandmother was tired of his grandfather and wanted someone to kill him. Defendant said that his grandmother would pay someone $2000 to do it. Armstrong agreed to assist with the murder but did not think that defendant was being serious.

¶ 27    Armstrong testified in the grand jury that in February 2013, he had another conversation with defendant about killing his grandfather. Defendant asked Armstrong if he was going to do it, and he responded, "Yes." Defendant told Armstrong to take his grandfather's bag after Armstrong killed him because it would have $1000 in it. Janet would give him the rest of the money.

¶ 28    Later that month defendant described the victim's routine to Armstrong. Defendant told him that his grandfather left the house about 3 or 3:30 a.m. to go to dialysis and that someone would be coming to pick him up. Defendant told Armstrong to just kill him, run out of the gate, and meet defendant in the alley. Armstrong told the grand jury that, on the evening of February 28, 2013, defendant told him to commit the murder on March 1 at 3 a.m. Armstrong said he received additional calls from defendant that night but did not answer.

¶ 29    On March 1, 2013, defendant told Armstrong, "tonight, no bullshit." Armstrong stated that he was expecting a call later that evening from defendant but did not get one and explained that he thought his phone was dead. On the morning of March 2, 2013, Armstrong saw that defendant has posted on Facebook that, "I can't believe my grandfather [*sic*] gone." Armstrong told the grand jury that he called defendant and asked him what happened and defendant told him that he did it himself.

¶ 30    Armstrong told the grand jury that about a week later he asked defendant if he could have the gun because he needed protection from gang members. Defendant later gave him the gun that belonged to the victim. Armstrong identified the gun that defendant gave him in open court. When Armstrong was arrested, he gave detectives information about where they could find the gun. He called his friend K.O. and had him hide the gun in a pile of bricks so that the police could recover it. He testified that when he called K.O. he did not know if K.O. had the gun, he had not given K.O. the gun, and K.O. did not know where the gun was stored. He claimed he just guessed that K.O. could obtain it. At this point the judge excused the jury and admonished Armstrong for being "purposely evasive" and "fooling around" when he actually

knew the answers to a lot of the questions. Armstrong stated that he did not shoot the victim and did not meet with Janet to get paid for the murder.

¶ 31      Chicago police officer Mark Reno testified that on March 28, 2013, he was contacted by a detective who asked him to respond to the area of 2445 East 74th Place to retrieve a firearm from a pile of rocks. Officer Reno located a .25-caliber semiautomatic Berretta pistol in the pile. When he recovered the weapon, it had a magazine and was loaded with nine live rounds. Officer Reno photographed it.

¶ 32      Jon Flaskamp, a forensic scientist specializing in firearms ammunition, was qualified as an expert in the field of firearms examination and identification. He examined five fired shell casings and three fired bullets recovered from the crime scene and from the victim's body. He also received and examined the .25-caliber Beretta and the nine unfired cartridges. Flaskamp concluded that the three bullets recovered from the victim's body were fired from the .25-caliber Beretta and the shell cases recovered from the gangway had also been fired from that gun. No DNA or fingerprint analysis was performed.

¶ 33      Chicago police officer Brian Cunningham testified that he responded to the scene of the homicide in the early morning hours of March 2, 2013. Defendant was placed into custody on March 28, 2013. During processing, Officer Cunningham learned that Janet Strickland's cell phone number was xxx-xxx-4816 and that defendant was approximately six feet tall.

¶ 34      Officer Cunningham executed a search warrant for 454 East 95th Street and recovered an owner's manual for a plasma TV, assembly instructions for an entertainment center with a fireplace and refrigerator, and a sales receipt dated March 20, 2013, showing that defendant purchased a 2000 Pontiac Grand Prix for $3500 in cash. The sales receipt listed defendant's name, William Strickland, and his phone number, xxx-xxx-7482.

¶ 35      Joseph Raschke, a special agent in the FBI in the field of historical cell cite analysis, was qualified as an expert in that field. Agent Raschke testified that he was provided phone records for Armstrong's Sprint phone (xxx-xxx-9797) and Janet Strickland's cell phone (xxx-xxx-4816), which defendant frequently borrowed.

¶ 36      Agent Raschke utilized "call detail records" to ascertain the date and time of the calls, as well as the numbers for the incoming and outgoing calls. He explained that from 7:20 p.m. on March 1, 2013, to 10:49 p.m. on March 2, 2013, Armstrong's phone used the same tower and sector, which was located several blocks from 7400 South Phillips Avenue and was consistent with the phone being used in that area. The phone records from Armstrong's phone showed that a call was made to Janet Strickland's phone at 9 a.m. on March 2, 2013.

¶ 37      From 7:45 p.m. on March 1, 2013, to 9:01 a.m. on March 2, 2013, Janet's phone, which defendant was using, connected with various cell towers on the south side of Chicago, consistent with Smith's and Stitts's testimony. From 12:41 a.m. to 1:23 a.m. Janet's phone was using a cell tower and sector near 454 East 95th Street. From 1:25 a.m. to 2:18 a.m. on March 2, 2013, the phone also utilized a cell tower and sector near 454 East 95th Street. Janet's phone was used to call 911 at 3:30 a.m. After the murder, from 3:44 a.m. to 9:01 a.m., 30 calls were made utilizing the cell tower and sector near the 454 East 95th Street. The phone records also showed that calls were placed from Janet's phone to Armstrong's phone seven times between 7:59 p.m. on March 1, 2013, and 2:18 a.m. on March 2, 2013. Most of those calls were less than one second long.

¶ 38    The State rested. Defendant did not testify. After hearing all of the evidence, the jury found defendant guilty of first degree murder. Defendant's motion for a new trial was denied. He was sentenced to 40 years' imprisonment. This appeal followed.

¶ 39                                        ANALYSIS

¶ 40    Defendant first argues that the trial court erred when it denied his request for IPI Criminal 4th No. 3.17, the accomplice witness instruction. Defendant argues that there was evidence that defendant had several accomplices, namely Lavetta Smith and Danny "Black" Armstrong, participate in the planning and commission of the murder.

¶ 41    IPI Criminal 4th No. 3.17 provides: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

¶ 42    The jury instruction conference in this case was held off the record. On the record however, the court stated that it considered defendant's request of IPI Criminal 4th No. 3.17 regarding the testimony of an accomplice. The court denied the request stating:

> "I do not believe that evidence that the jury heard would have this instruction apply to it. Lavetta Smith never said that she was an accomplice. I don't know that anything that she did testify to would be something she could be indicted for which is part of the Committee comments which you were to consider to give this instruction or not. This [is] actually for flippers. I don't know that she is a flipper necessarily, because I don't know that she was in harm's way for the things that she testified to."

¶ 43    In determining whether the accomplice jury instruction should have been given, the trial court considers whether there is probable cause to believe that the witness was guilty of the offense either as a principal or as an accessory. *People v. Harris*, 182 Ill. 2d 114, 144 (1998). If, under the totality of the evidence and the reasonable inferences drawn therefrom, the evidence establishes probable cause to believe the witness was present at the crime, failed to disapprove of the crime, and that he participated in the planning or commission of the crime, the accomplice jury instruction should be given. *People v. Caffey*, 205 Ill. 2d 52, 116 (2001). An individual's presence at the scene of the crime, knowledge the crime is being committed, close affiliation to the defendant before and after the crime, failing to report the crime, and fleeing from the scene of the crime may be considered in determining whether the individual may be accountable for the crime or shared a common criminal plan or agreement with the principal. *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995). After the trial court reviews all the evidence and determines there is insufficient evidence to justify the giving of a particular jury instruction, its determination will not be overturned except for a finding of an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42.

¶ 44    Defendant argues that the accomplice witness instruction should have been given because there was probable cause to believe that Lavetta Smith and Danny "Black" Armstrong were guilty of the murder on the theory of accountability under section 5-2(c) of the Criminal Code of 2012 (720 ILCS 5/5-2(c) (West 2012)). Section 5-2(c) provides that a person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." *Id.*

¶ 45    Defendant argues that there is probable cause to establish that Smith and Armstrong acted as accomplices in the shooting death of Strickland. Defendant argues that Smith learned of the plan to kill Strickland, let defendant back into the getaway car and drove off with him, received a share of the proceeds by way of jewelry, shoes and tattoos, and did not implicate defendant until four weeks later, after she was arrested for this offense. Defendant argues that there was probable cause to indict Armstrong because he knew of defendant's plan to kill his grandfather and agreed to do it for $2000. Then after the murder, Armstrong possessed the gun and told police where to find it.

¶ 46    Defendant relies on *People v. Cobb*, 97 Ill. 2d 465 (1983), and *People v. Winston*, 160 Ill. App. 3d 623 (1987), to support his position that the jury should have been instructed using IPI Criminal 4th No. 3.17. In *Cobb*, two defendants were convicted of the murder and armed robbery of the owner and a customer of a diner. On appeal, they argued that Illinois Pattern Jury Instructions, Criminal, No. 3.17 (1st ed. 1968) (hereinafter IPI Criminal 1st No. 3.17) should have been given with respect to the testimony of a key state witness, Santini. Santini had testified that on the night in question she had driven the defendants around for several hours when Cobb ordered her to stop the vehicle at a liquor store and to wait in the car and keep the engine running. Approximately 15 minutes later, the defendants ran back to the car and told Santini to " 'get the hell out of here.' " *Cobb*, 97 Ill. 2d at 472-73. Cobb allegedly grabbed Santini's hair when she said she did not know where to go. While she drove the defendants to a friend's house, she heard the defendants saying that they did not get as much money as they had expected. Santini stated that she did not know that they had committed murder and armed robbery until the next day but that she did not call the police because she feared what would happen to her. The defendant argued that the trial court erred in failing to give IPI Criminal 1st No. 3.17 based on the evidence supporting Santini's involvement.

¶ 47    Our supreme court held that the failure to give the accomplice witness instruction was prejudicial error and that the defendant was entitled to a new trial "on that ground alone." *Id.* at 481. The court noted that Santini had kept the motor running in the escape car while the crime was committed, drove the defendants away from the scene, and heard them discuss the crime but did not call the authorities. The *Cobb* court found that probable cause existed to indict Santini either as a principal or on the theory of accountability, despite her assertion of innocence. *Id.* at 476. The court also noted that Santini was the prosecution's most important witness and, absent her testimony, the State would be left with only circumstantial evidence. *Id.* at 478.

¶ 48    In *Winston*, 160 Ill. App. 3d at 625, the defendant robbed a store at gunpoint. Another man, Nelson, was in the store at the time of the robbery. Nelson knew defendant through mutual friends and testified at trial that he was present when the defendant and another man were planning the robbery and that the defendant asked him to participate, but he refused. He claimed he was in the store during the time of the robbery because he was playing video games. The defendant requested Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.17), which the court refused. *Winston*, 160 Ill. App. 3d at 630.

¶ 49    On appeal, the defendant argued that the court erred when it refused his request to instruct the jury using IPI Criminal 2d No. 3.17. This court agreed, finding that,

        "Nelson claimed to have been with defendant while defendant and another man planned the robbery. He was present at the scene at 5 a.m., and there was testimony that he

behaved suspiciously there—leaving when customers entered and reentering after they had left. He then met with the defendant immediately after the robbery and was offered a share of the booty. He did not approach the police until one week later and then turned over to them items taken during the robbery which he claimed to have found." *Id.* at 631.

We concluded that Nelson's actions were similar to those taken by the witness in *Cobb* and were not as incriminating. See *Cobb*, 97 Ill. 2d at 476. Nelson could have been indicted for armed robbery because he was an accomplice, and therefore the court erred in refusing to give a cautionary instruction regarding his testimony to the jury.

¶ 50     We find *Cobb* and *Winston* factually distinguishable. Although Smith was in the car, sleeping, while defendant committed the offense, she was not a participant nor did she agree to cooperate with defendant's plan or help him escape. She merely drove away with defendant with no evidence that she was actually aware of what defendant did or did not do after he left the car. She also did not share in any of the direct proceeds from the robbery itself. Likewise, Armstrong did not participate in the offense, and despite his initial agreement, Armstrong testified that he did not believe that defendant was serious, defendant's statements to his grandmother described "Black" as "playing" about his willingness to get involved, and in summary, there was no direct evidence that Armstrong participated in the murder.

¶ 51     " 'To constitute one an accomplice he must take some part, perform some act or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime.' " *People v. Robinson*, 59 Ill. 2d 184, 191 (1974) (quoting *People v. Hrdlicka*, 344 Ill. 211, 222 (1931)). Further, one is not an accomplice merely because he " 'has guilty knowledge or is morally delinquent or who was even an admitted participant in a related but distinct offense.' " *Id.* (quoting *Hrdlicka*, 344 Ill. at 222).

¶ 52     Here, the evidence is insufficient to establish that Smith or Armstrong played a role in the planning or commission of the murder. While Smith's failure to do anything to thwart defendant's plan is at the very least morally offensive, there is no evidence to establish that she was legally accountable for defendant's conduct because she did nothing to participate or facilitate the offense. The evidence established that Smith slept in defendant's car that was parked about a block north of the homicide scene and drove away with defendant after he returned. There is no evidence that she knew what defendant did when he was gone. This does not make her an accomplice to this murder. See *Harris*, 182 Ill. 2d at 144-45.

¶ 53     With respect to Armstrong, although his initial conversations with defendant may suggest his acquiescence to the murder, there is nothing in the record to establish that he was an accomplice. Armstrong denied participation in the offense, and there were witnesses who testified that defendant stated that he would kill his grandfather himself. The evidence suggests that defendant knew Armstrong "was playing." When defendant called Armstrong before the murder, Armstrong did not even answer the phone. In addition, there is no evidence to suggest that Armstrong was the other man Cleveland saw running from the scene. Therefore, we find that the trial court did not abuse its discretion in denying defendant's request to give IPI Criminal 4th No. 3.17.

¶ 54     Even if the failure to give IPI Criminal 4th No. 3.17 was error, any error was harmless where the instructions as a whole "correctly and fully instruct the jury." *People v. Garner*, 248 Ill. App. 3d 985, 990-91 (1993). In this case, the jury was instructed that:

- 9 -

"Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in light of all the evidence in the case." IPI Criminal 4th No. 1.02.

This instruction negated any effect that the failure to issue IPI Criminal 4th No. 3.17 may have had. We find that the trial court did not err in refusing to instruct the jury using IPI Criminal 4th No. 3.17.

¶ 55        Defendant also argues that his fourth amendment right to be free from unreasonable searches was violated when the State obtained his cellular site location information (CSLI) data without a warrant in violation of *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206 (2018). The CSLI in this case was obtained pursuant to a March 2013 grand jury subpoena. Defendant urges that the trial court erred when it denied his motion to suppress the CSLI on the basis that it was obtained without a search warrant or a court order supported by probable cause.

¶ 56        We note that defendant does not challenge the evidence regarding what calls were placed from which phone. Defendant only challenges the data used by Agent Raschke's testimony as to where Janet's cell phone was in relation to the murder scene throughout the night of March 1 and the early morning of March 2. When this court considers a ruling on a motion to suppress involving a question of probable cause or reasonable suspicion, we review the trial court's findings of historical facts only for clear error and must give due weight to inferences drawn from those facts. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Therefore, the trial court's factual findings will be reversed only if they are against the manifest weight of the evidence. *Id.* We review *de novo* the trial court's ultimate determination of a defendant's legal challenge to the denial of his motion to suppress. *Id.* The key facts pertaining to the acquisition of the CSLI are not in dispute. Thus, we review *de novo* whether those facts justified the denial of defendant's motion to suppress.

¶ 57        In *Carpenter*, the United States Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI," so the third-party doctrine does not apply and obtaining CSLI from a wireless carrier amounts to a "search" under the fourth amendment. *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2217. The Supreme Court concluded that issuance of a subpoena for CSLI data was not "a categorical limitation on Fourth Amendment protection." *Id.* at ___, 138 S. Ct. at 2222. Therefore, law enforcement "must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at ___, 138 S. Ct. at 2221.

¶ 58        The State concedes that, based on *Carpenter*, the warrantless acquisition of the CSLI from Janet's cell phone violated defendant's fourth amendment rights. However, the State argues that this concession should not end our inquiry regarding the admissibility of the evidence because *Carpenter* was decided almost five years after the CSLI was obtained in this case. The State claims that the good-faith exception to the exclusionary rule applies to the warrantless acquisition of CSLI through the issuance of a grand jury subpoena before the decision in *Carpenter*. In the alternative, the State argues that the admission of the CSLI was harmless error.

¶ 59    Generally, courts will not admit evidence obtained in violation of the fourth amendment. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006). The exclusionary rule was created as a general deterrent to future fourth amendment violations. *Arizona v. Evans*, 514 U.S. 1, 10 (1995). "[T]he 'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). For the exclusion of the evidence to apply, the benefit of suppression must outweigh the "substantial social costs." *United States v. Leon*, 468 U.S. 897, 909 (1984). The Supreme Court has repeatedly expressed the notion that "exclusion 'has always been our last resort, not our first impulse.' " *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

¶ 60    Searches conducted without a warrant are *per se* unreasonable under the fourth amendment, subject only to a few exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). However, when a fourth amendment violation has occurred, it does not necessarily follow that the evidence will be excluded. The good-faith exception to the exclusionary rule has been codified in section 114-12(b)(1), (2) of the Code of Criminal Procedure of 1963:

> "(1) If a defendant seeks to suppress evidence because of the conduct of a peace officer in obtaining the evidence, the State may urge that the peace officer's conduct was taken in a reasonable and objective good faith belief that the conduct was proper and that the evidence discovered should not be suppressed if otherwise admissible. The court shall not suppress evidence which is otherwise admissible in a criminal proceeding if the court determines that the evidence was seized by a peace officer who acted in good faith.

> (2) 'Good faith' means whenever a peace officer obtains evidence:

> (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid; or

> (ii) pursuant to a warrantless search incident to an arrest for violation of a statute or local ordinance which is later declared unconstitutional or otherwise invalidated." 725 ILCS 5/114-12(b)(1), (2) (West 2012).

¶ 61    Recently, our supreme court has expanded the good-faith exception to the exclusionary rule to include good-faith reliance upon binding appellate precedent that specifically authorized a particular practice but was subsequently overruled. See *People v. LeFlore*, 2015 IL 116799, ¶¶ 29-31 (citing *Davis v. United States*, 564 U.S. 229, 241 (2011)); see also *People v. Burns*, 2016 IL 118973, ¶ 49; *cf. People v. Krueger*, 175 Ill. 2d 60 (1996) (finding the good-faith exception to the exclusionary rule where an officer relied on a statute later declared unconstitutional was not recognized in Illinois as it was in violation of the Illinois Constitution).

¶ 62    In *LeFlore*, 2015 IL 116799, our supreme court held that the exclusionary rule did not apply to evidence obtained as a result of warrantless placement by police of a global positioning system (GPS) device on a vehicle that the defendant drove. The *LeFlore* court articulated three very specific reasons for its findings. First, the detective who placed the GPS on the defendant's vehicle could have reasonably relied on the "binding appellate precedent" set forth in *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S.

705 (1984). *LeFlore*, 2015 IL 116799, ¶ 31. Both *Knotts* and *Karo* dealt with the placement of beepers by law enforcement personnel in suspect's vehicles, which allowed the authorities to track the suspects' locations. In *Knotts*, 460 U.S. 276, the Supreme Court ruled that the use of the beeper to track a vehicle was not a search under the fourth amendment. In *Karo*, 468 U.S. 705, the court ruled that the warrantless installation of the beeper did not violate the fourth amendment. The *LeFlore* court found that it was "objectively reasonable for the police to rely upon *Knotts* and *Karo* for the conclusion that warrantless installation and monitoring of the GPS device was legal." *LeFlore*, 2015 IL 116799, ¶ 38. The court found the difference between a beeper and a GPS device to be factually insignificant. *Id.*

¶ 63    Second, the *LeFlore* court found that, pursuant to the Supreme Court's good-faith analysis that required a consideration of "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances" (internal quotation marks omitted) (*Herring v. United States*, 555 U.S. 135, 145 (2009)), the "police conduct in relying on the legal landscape that existed at the time was objectively reasonable and a reasonable officer had no reason to suspect that his conduct was wrongful under the circumstances." *LeFlore*, 2015 IL 116799, ¶ 31. The court stated, "Given the state of the law with which police officers were faced in 2009, there is no merit to defendant's intimation that the police in this case were risking that their conduct would be held unconstitutional. To characterize the officer's conduct in such a manner is simply not a fair assessment in view of the legal landscape." *Id.* ¶ 53.  The state of the law that *LeFlore* referenced was "the rationale of *Knotts* and *Karo* and how they were widely and reasonably understood to stand for the proposition that the fourth amendment was simply not implicated by electronic surveillance of automotive movements." *Id.* ¶ 52.

¶ 64    Finally, the *LeFlore* court found that the Seventh Circuit Court of Appeals decision in *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), to be "binding appellate precedent" that "specifically authorized the police practice of attaching a GPS device to a vehicle without a warrant in the Seventh Circuit, which geographically includes Illinois." *LeFlore*, 2015 IL 116799, ¶ 31, 56.

¶ 65    Unlike *LeFlore*, where our supreme court had an abundance of relevant fourth amendment jurisprudence and specific, binding appellate precedent to rely on in finding that the exclusionary rule did not apply, we lack such guidance. The parties agree that prior to *Carpenter* there were no Illinois state court decisions examining the relationship between the fourth amendment and acquisition of CSLI, nor was there any specific statutory requirement requiring a warrant for the acquisition of CSLI. We have found no Illinois case law that expressly allowed or prohibited the acquisition of CSLI without a search warrant. We similarly failed to find any binding appellate precedent in the Seventh Circuit. As the State points out, the Seventh Circuit twice declined to resolve the issue presently before us. See *United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015); *United States v. Thousand*, 558 F. App'x 666, 670 (7th Cir. 2014).

¶ 66    The State argues that the legal landscape regarding the position of federal appeals courts on the issue of whether CSLI was protected by the fourth amendment is apparent by the court's discussion in *Thousand*, 558 F. App'x at 670. The *Thousand* court remarked,

> "Recently the Fifth Circuit concluded that Supreme Court precedent 'does not recognize a situation where a conventional order for a third party's voluntarily created business records transforms into a Fourth Amendment search or seizure,' and thus the

court rejected the contention that using court orders available through the Stored Communications Act to collect historical cell-tower data without a showing of probable cause is unconstitutional. *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 614-15 (5th Cir. 2013); see also *In re Application of U.S. for Order Directing Provider of Elec. Commc'n, Serv. to Disclose Records to Gov't*, 620 F.3d at 313-15 (concluding that, although § 2703(d) does not require authorities to show probable cause to obtain historical cell-tower data, judges have authority in particular cases to reject § 2703(d) applications and instead require use of search warrant establishing probable cause); *United States v. Forest*, 355 F.3d 942, 950-52 (6th Cir.2004) (concluding that DEA use of cell-site data was not a 'search' under Fourth Amendment because authorities tracked defendant's movements along public highways), *vacated on other grounds sub. nom. Garner v. United States*, 543 U.S. 1100, 125 S. Ct. 1050, 160 L.Ed.2d 1001 (2005)." *Id.*

The court went on to find that it had "not found any federal appellate decision accepting [the] premise that obtaining cell-site data from telecommunications companies—under any factual scenario—raises a concern under the Fourth Amendment," but declined to address the issue on its merits as the issue was not properly before the court. *Id.*

¶ 67 The State also cites several cases from other federal appeals courts that held that the acquisition of CSLI did not constitute a search or seizure subject to the fourth amendment warrant requirement. See *United States* v. *Thompson*, 866 F.3d 1149, 1154-60 (10th Cir. 2017); *United States* v. *Graham*, 824 F.3d 421, 425-38 (4th Cir. 2016); *United States* v. *Zodhiates*, 901 F.3d 137, 144 (2d Cir. 2018). The State claims that these cases establish that before *Carpenter* courts routinely sanctioned the warrantless acquisition of CSLI.

¶ 68 We find that we need not reach the issue of whether the exclusionary rule or the good-faith exception should apply to the CSLI in this case. Even if the CSLI was improperly admitted here, any error was harmless error because its suppression would not have changed the outcome of defendant's trial, as the State acknowledges. See, *e.g.*, *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 72 (declining to reach question of whether constitutional right of confrontation violated where any error was harmless).

¶ 69 In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). When deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction, or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 70 Focusing on the other admissible evidence that defendant does not dispute, including the admissible incoming and outgoing call records, we find that the other properly admitted evidence overwhelmingly supported his conviction. The testimony was that defendant and Janet shared the cell phone. In addition, defendant and Janet lived in the same house with the victim. The presence of Janet's cell phone in the vicinity of the house where the murder was committed was of little importance in establishing defendant's guilt. The most powerful and damning evidence came from his mother Lesley, Smith, and Armstrong, which we note has gone unchallenged by defendant on appeal.

¶ 71     Lesley testified that defendant told her that Janet "had it done"; that Janet had asked him if he knew anybody who would kill the victim and, in response, defendant met with "Black"; that defendant "was there at 2 o'clock to pick up the guy, to set it up for the shooting"; that Janet had bought him a car in exchange for his silence; that defendant said he met with "Black" around 2 a.m. to discuss shooting the victim and that was why Janet bought him the car; that defendant asked her to contact Smith because he did not want her to testify; and that, lastly, he knew his fingerprints were not on the gun.

¶ 72     Smith testified that she overheard a conversation with defendant and Janet where Janet said that she was going to poison the victim. In February 2013, she heard another conversation between defendant and Janet about killing the victim. Defendant said that he needed a gun before the next day and would get it from Janet. Smith testified that when Armstrong refused to kill the victim, defendant then said he was "was gonna kill his grandfather himself." Defendant woke Smith up from where she slept on Stitts's couch and said they were "fittin' to go, he was going to do this," which Smith understood to mean that he was going to "kill his grandpa." Defendant and Smith left Stitts's house and drove to the victim's home. Defendant parked the car on the next block in the alley. Defendant was armed with the same gun Smith had previously identified in open court. Defendant told Smith to keep the doors unlocked and ran toward the alley. She awoke to defendant knocking on the window. Defendant put a brown bag in the back seat and the drove back to Stitts's house. When they arrived, defendant used Stitts's phone to call Janet. Smith heard defendant say, "Is he dead?" Smith and defendant left Stitts's house and went back to the victim's house. Smith heard defendant ask Stitts "to put up" the gun for him.

¶ 73     Armstrong testified that he agreed to assist with Strickland's murder for $2000 but did not think that defendant was being serious. Defendant told Armstrong to take his grandfather's bag after Armstrong killed him because it would have $1000 in it. Defendant told him that his grandfather left the house about 3 or 3:30 a.m. to go to dialysis and that someone would be coming to pick him up. Defendant told Armstrong to just kill him, run out of the gate, and meet defendant in the alley. Armstrong told the grand jury that, on the evening of February 28, 2013, defendant told him to commit the murder on March 1 at 3 a.m. Armstrong said he received additional calls from defendant that night but did not answer. On March 1, 2013, Armstrong spoke with defendant who told Armstrong, "tonight, no bullshit." Armstrong stated that he was expecting a call later that evening from defendant but did not get one and explained that he thought his phone was dead. On the morning of March 2, 2013, Armstrong saw that defendant has posted on Facebook that "I can't believe my grandfather [sic] gone."

¶ 74     Additionally, Cleveland saw one of the shooters, about six feet tall, pick-up a bag and run north towards the alley, corroborating both Smith's testimony describing defendant's path and his returning with a bag and Detective Cunningham's testimony regarding defendant's height. The evidence of defendant's purchase of an automobile shortly after the murder added to the reasonable inferences that the jury could draw from all the otherwise admissible evidence to find defendant guilty beyond a reasonable doubt. Finally, the evidence connecting defendant with the murder weapon before and after the murder was compelling. In our view, the evidence in support of defendant's conviction was overwhelming and the admission of the CSLI testimony was harmless beyond a reasonable doubt.

¶ 75     *People v. Herring*, 2018 IL App (1st) 152067, provides support for our conclusion that, even if the trial court had suppressed the CSLI, the outcome would be the same. In *Herring*,

the defendant lived near the location where he killed the victims. An FBI agent with expertise in CSLI testified about the cell towers that the defendant's phone connected with around the time of the murders, showing that his phone was in the vicinity at the time. *Id.* ¶¶ 46, 98-100. We found the evidence to be "unimportant," stating "[h]ad Herring presented an alibi defense, say he had been across town when the murder occurred, then the agent's evidence would have been meaningful." *Id.* ¶ 100. Similarly, here, the CSLI evidence was unimportant where it merely placed defendant in the vicinity of the crime scene, which happened to be where defendant resided, at the time of the murder. There was no testimony from anyone indicating that defendant was not in the vicinity of the location when the murder was committed. In fact, Smith's testimony was that defendant was in the alley behind the house at the time. The evidence was overwhelming, and the admission of the CSLI evidence was harmless beyond a reasonable doubt.

¶ 76                                               CONCLUSION

¶ 77            For the foregoing reasons, we affirm the judgment of the trial court.

¶ 78            Affirmed.