2022 IL App (1st) 200290-U

FIFTH DIVISION
MAY 6, 2022

No. 1-20-0290

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 11720 |
| | ) | |
| SHELBY TURNER, | ) | Honorable |
| | ) | Arthur F. Hill, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's convictions and sentence are affirmed where the State proved him guilty beyond a reasonable doubt, the trial court did not abuse its discretion in not issuing IPI Criminal No. 3.17 to the jury, and his sentence did not violate the proportionate penalties clause of the Illinois Constitution.

¶ 2    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Shelby Turner, was convicted of one count of first degree murder and two counts of attempted murder and was sentenced to an aggregate term of 61 years' imprisonment. The defendant now appeals, arguing that the State failed to prove him guilty beyond a reasonable doubt; the trial court erred in not issuing jury instruction 3.17 to the jury; and his sentence violates the proportionate penalties

clause of the Illinois Constitution. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     The State charged the defendant with first degree murder, attempted murder, and aggravated discharge of a firearm. The charges arose out of a shooting on June 27, 2016, where a passing car opened gunfire on a group of people standing outside of a house. Clarence Jones was killed in the shooting. No one else was injured. The State also charged the defendant's co-defendant, Gary Johnson, and a separate but joint jury trial commenced in August 2019. The following evidence was presented.[1]

¶ 5     Wilmon Jones testified that in June 2016, he lived with his brother, Clarence Jones, his two sisters, and their mother, at 11433 South Stewart Avenue in Chicago.[2] On June 27, 2016, Wilmon was sitting on the front porch of his home with Clarence and another man, Gregory Baker. Their friend, John Washington, then arrived. After Mr. Washington parked his car, Wilmon, Clarence, and Mr. Baker walked down to the walkway to greet him. The four men stood in the walkway of the house, near the street, talking to each other.

¶ 6     "[A]ll of a sudden" a gray four-door car "pulled up" and stopped in front of the house. Wilmon testified that he was "[m]aybe like seven, eight feet" away from the car. When the car stopped, Wilmon saw a person hanging out of the back passenger window at his waist. The person was holding a gun. Wilmon became "hypnotized" and did not take his eyes off the gun. Wilmon

---

[1]Prior to trial, the defendant filed a motion to suppress identifications, which the trial court initially granted. The State then filed a motion to reconsider, and following a hearing, the trial court granted the motion and allowed the State's witnesses to make in-court identifications of the defendant and also testify regarding their photo arrays and live lineups identifications. That ruling is not at issue in this appeal.

[2]Because Wilmon and Clarence share the same last name, we will refer to them by their first names.

then thought that the gun looked "jammed," which gave him "a chance to think" and to "run ***
for [his] life." Wilmon ran towards the back porch of the house. As he ran, he heard approximately
nine or ten gunshots. He then heard Clarence yell that he had been shot. Wilmon ran back to the
front porch, where he saw Clarence, Mr. Baker, and Mr. Washington laying on the ground. The
gray car was driving away.

¶ 7      Wilmon further testified that Mr. Baker and Mr. Washington stood up and realized that
they had not been shot. Wilmon and Mr. Baker tended to Clarence and his gunshot wounds. An
ambulance took Clarence to the hospital, where he passed away a couple of weeks later from his
injuries. Wilmon subsequently spoke with the police and looked at photo arrays and live lineups,
but he was never able to identify the shooter because he was just "focused on the gun" and did not
see the shooter's face.[3]

¶ 8      Latoya Thompson testified that on June 27, 2016, a little after 2 p.m., she was picking up
her children from her aunt's house, located at 11441 South Stewart Avenue. Her children's father,
Thomas Williams, was also with her. They were standing outside of the house with their kids and
Ms. Thompson's aunt on the front sidewalk, close to the street. Mr. Williams suddenly tapped Ms.
Thompson on the shoulder to get her to look in the direction of the street. Ms. Thompson testified
that when she looked at the street, she saw a "guy hanging out the window" of a four-door,
champagne-colored car. Ms. Thompson testified that she was about 50 feet away from the car and
there was nothing obstructing her view of it. The car was parked in front of the neighbor Clarence's
house, where there were about "three or four" "old men" standing out front.

---

[3]Mr. Baker testified consistently with Wilmon.

¶ 9     Ms. Thompson believed she saw three other people inside the car in addition to the person hanging out of the window, although she only had a clear view of that person. The person hanging out of the back passenger window at his waist had a gun in both of his hands. In court, Ms. Thompson identified the defendant as that person. She testified that the defendant started shooting; he shot about five or six shots for approximately "two minutes." When the shooting started, Ms. Thompson "grabbed [her] kids and [she] was just looking." She then saw the group of men in front of Clarence's house "down on the ground." The car drove away with a "muffler [that] was loud."

¶ 10    Shortly afterwards, Ms. Thompson and Mr. Williams rode with police officers about six blocks away, where she identified the car that had been involved in the shooting. It was parked and a police officer turned it on. Ms. Thompson testified that when it was turned on, she noticed "it was the same car because the car was loud." The following day, Ms. Thompson went to the police station where she looked at a photo array. She was initially torn between two people in the photo array who looked alike. Eventually, she identified an individual in the photo array who was not the defendant. She told the police she wanted to see them in person, and she then viewed a live lineup. In the lineup, Ms. Thompson identified the defendant as the shooter.

¶ 11    Thomas Williams testified next, and he testified consistently with Ms. Thompson concerning the shooting. He could clearly see the shooter's face as he hung outside the car window. In court, he identified the defendant as the shooter.

¶ 12    When police arrived on the scene, Mr. Williams described the shooter as a black male, "17 to 30 years of age, with a medium complexion, a low haircut, and wearing a dingy-white or light-colored T-shirt." Approximately 15 to 20 minutes later, Mr. Williams and Ms. Thompson went with the police to see a car parked nearby. Mr. Thompson identified it as the car involved in the shooting. The next day, Mr. Thompson went to the police station to view a photo array. He

"immediately" identified the defendant in the photo array as the shooter. He then viewed a live lineup and again identified the defendant as the shooter.

¶ 13    Chicago Police Officer Quincy Percy testified that he responded to the shooting just after 2 p.m., on June 27, 2016. At the scene, he interviewed several witnesses who described the car involved in the shooting as a "silver or gray Toyota four-door." He then "toured the area" and came upon a car that matched the description at 119th Street and Halsted Street. He radioed for other police officers and followed the car. At 117th Street and Halsted Street, Officer Percy pulled the car over. As he exited his police car, two other officers also arrived and approached the car. Officer Percy saw four people inside the car. He identified the defendant as the person who was sitting in the rear passenger seat. Officer Percy testified that he later learned that co-defendant Gary Johnson was sitting in the driver's seat, the person sitting in the front passenger seat was Kwon Johnson, and the person sitting next to the defendant in the back seat was Laquisha Carson. Officer Percy ordered the defendant out of the car. When the defendant exited the car, Officer Percy saw a shell casing in the back seat.

¶ 14    A firearms identification expert testified that the fired cartridge cases found at the scene of the shooting and the shell casing found on the car seat had been fired from the same gun.

¶ 15    Laquisha Carson testified next, explaining that she initially did not comply with a subpoena to testify in this case because she wanted to "avoid coming to court," and so she was in Cook County Jail on a contempt charge at the time. She was also on probation from a robbery conviction and testified that she had a prior felony conviction for possession of a firearm. Ms. Carson testified that she is a childhood friend of the defendant and co-defendant Gary Johnson. On June 27, 2016, co-defendant Gary Johnson picked her and the defendant up from her grandmother's house in his gray Toyota Camry. Kwon Johnson was also in the car. She and the defendant got into the back

seat. After driving around and running some errands, the group of friends was "supposed to" drive back to Ms. Carson's grandmother's house, but co-defendant Gary Johnson started driving down Stewart Avenue instead.

¶ 16     As they drove down Stewart Avenue, Ms. Carson saw the defendant, who was sitting in the rear passenger seat, pull a gun out from under the front passenger seat. She assumed he was about to start shooting someone with it and told him "not to do it." Co-defendant Gary Johnson then stopped the car in the middle of Stewart Avenue. The defendant leaned out of the rear passenger window and started shooting into a small group of men standing outside. Ms. Carson heard about 10 to 15 shots and saw the group of men either run away or fall to the ground. Co-defendant Gary Johnson then drove away. They drove to Ms. Carson's grandmother's house, which was just a few minutes away. The defendant went inside the house with the gun. The defendant returned to the car without the gun and the group of friends drove around in the area for a short while. Eventually, they were pulled over by the police near 116th Street and Halstead Street.

¶ 17     After the police pulled the car over, they arrested all four people inside and took them to the police station. When Ms. Carson arrived at the police station, she gave a statement to Chicago Police Detective Christopher Tenton. She testified that during that statement, she lied to Detective Tenton and told him that she was not present during the shooting. She testified that she lied because she was "scared" and "didn't want to go to jail for something [she] didn't do." When Detective Tenton was interviewing her, he asked her if she wanted "to be a witness or *** be an offender." In response, Ms. Carson asked him if she was "still going to jail" if she was a witness, to which he told her "no." Eventually, after a few more conversations with Detective Tenton, Ms. Carson told him "everything." She testified that her testimony that day was truthful pursuant to her attorney's

advice. She was never charged with anything in connection to the shooting.[4]

¶ 18    The State introduced video footage of the shooting obtained from a nearby surveillance camera as well as still photographs taken from the video. The State then rested. The defendant did not call any witnesses.

¶ 19    The defendant asked the court to give to the jury, Illinois Pattern Jury Instruction (IPI) 3.17 ("Testimony Of An Accomplice"), on the basis that there was evidence for Ms. Carson to be charged in the murder under a theory of accountability. IPI 3.17 provides: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." The trial court denied the defendant's request and did not provide IPI 3.17 to the jury.

¶ 20    Following deliberations, the jury found the defendant guilty of the first degree murder of Clarence Jones and the attempted murders of Wilmon Jones and Gregory Baker and that the defendant personally discharged a firearm that proximately caused Clarence's death.[5]

¶ 21    During the sentencing hearing, the State noted that the defendant had been arrested 17 times as a juvenile, had six adult misdemeanor arrests, and had one felony conviction for possession of a firearm by a gang member. In mitigation, defense counsel argued that the defendant: was 22 years old at the time of his offense; was raised in a neighborhood with high crime and drug activity; came from an unstable home; was in treatment for drugs and alcohol at age 11, and again at age 14; was in a psychiatric hospital at age 14; had poor grades, was learning

---

[4]Detective Tenton testified that he interviewed Ms. Carson but did not testify to the substance of the interview.

[5]Co-defendant Gary Johnson was acquitted of all charges.

disabled, and suffered from a speech and language impediment; was diagnosed with depressive disorder and attention deficit with hyperactivity disorder; and had a lack of meaningful family supervision.

¶ 22    In sentencing the defendant, the trial court noted that even though the defendant was not a juvenile, he was still young at 22 years old, and so the trial court considered the defendant's youthful characteristics pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). The trial court also noted the defendant's prior conviction for possession of a firearm. The trial court sentenced the defendant to 30 years' imprisonment for first degree murder and added on a 25-year firearm enhancement. The trial court merged the two counts of attempted murder and sentenced the defendant to 6 years' imprisonment for that conviction. The defendant's aggregate sentence came to 61 years.

¶ 23    The trial court denied the defendant's motion to reconsider his sentence. This appeal followed.

¶ 24                                    ANALYSIS

¶ 25    We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 26    The defendant presents the following issues for our review: (1) whether the State failed to prove him guilty beyond a reasonable doubt; (2) whether the trial court erred in not providing IPI 3.17 to the jury; and (3) whether the defendant's sentence violates the proportionate penalties clause of the Illinois Constitution. We take each issue in turn.

¶ 27    The defendant first argues that the State failed to prove him guilty beyond a reasonable doubt. Specifically, the defendant claims that the evidence was insufficient to establish that he was the shooter. The crux of his argument is that the identifications of Ms. Thompson and Mr. Williams

were unreliable because they had "very little opportunity to view the shooter" and "the procedures used in the photo arrays they viewed were so suggestive *** as to render the identifications meaningless." He also claims that Ms. Thompson's description of the shooting is contradicted by the surveillance video footage of the shooting. Further, he argues that Ms. Carson's testimony was incredible because she "repeatedly lied to the police while in custody as a suspect for the same shooting," and she identified the defendant as the shooter "only after she was assured the police would treat her as a witness and not a participant in the shooting." He therefore asserts that his conviction should be reversed.

¶ 28    When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. "The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts." *Id.* The reviewing court does not retry the defendant and must draw all reasonable inferences in favor of the State. *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id.*

¶ 29    The defendant does not contest the elements of the offenses but instead challenges the reliability and credibility of the witness identifications of him as the shooter. "Where identification is the main issue, the State must prove beyond a reasonable doubt the identity of the individual who committed the charged offenses." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 75. In assessing identification testimony, Illinois courts utilize a five-factor test established in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), known as the *Biggers* factors. *Id.*

The *Biggers* factors are: (1) the opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Id.*

¶ 30    Notably, some of the defendant's argument is about the dependability of the witness testimony identifying him as the shooter, but he does not challenge the *admissibility* of those identifications. Rather, he merely asserts that the evidence establishes that Ms. Thompson's and Mr. Williams' identifications of him as the shooter were unreliable. Considering the *Biggers* factors, both Ms. Thompson and Mr. Williams testified that they were only several feet away from the car from which the defendant shot, and so they had an unobstructed view of the shooter's face. This weighs in favor of the State. See *People v. Slim,* 127 Ill. 2d 302, 307 (1989) (the identification of a defendant by a single witness is sufficient to sustain a conviction where the witness viewed the defendant under circumstances that permitted a positive identification). And less than an hour after the shooting, Mr. Williams gave a description of the shooter to the police and identified the car involved in the shooting. *The very next day* he identified the defendant as the shooter in both a photo array and a live lineup. Mr. Williams testified that his identification was certain and immediate, which strongly supports reliability pursuant to the *Biggers* factors.

¶ 31    The defendant makes much of the fact that Ms. Thompson testified that when she viewed the photo array, she was torn between two different people and identified someone other than the defendant. Yet, she did ultimately identify the defendant as the shooter in a live lineup and in court, so it was up to the jury to resolve that conflict. "The reliability of a witness's identification of a defendant is a question for the trier of fact." *In re Keith C.*, 378 Ill. App. 3d 252, 258 (2007). Under these facts and circumstances, we cannot say that Ms. Thompson's and Mr. Williams'

identifications of the defendant as the shooter were unreliable.

¶ 32    As to the defendant's argument that the surveillance video footage contradicted Ms. Thompson's description of the shooting, that was also for the jury to resolve. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (it is the responsibility of the trier of fact to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence). We additionally note that, in reviewing the testimonies, we did not find any discrepancies. Further, even if there were discrepancies in the testimony, that would not automatically render the testimony incredible. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 17. It is for the trier of fact to resolve any such conflicts. *Id.*

¶ 33    The defendant also asserts that Ms. Carson's testimony was incredible since she testified that she initially lied to the police about the shooting. Again, that is not a *discrepancy in testimony*. Indeed, Ms. Carson testified that her attorney had advised her to testify honestly after being in jail on a contempt charge. She then testified that her testimony about the defendant being the shooter was truthful despite previously denying being present during the shooting. The defendant also emphasizes that Ms. Carson identified the defendant as the shooter only after Detective Tenton asked her if she wanted "to be a witness or *** be an offender." However, the jury heard Ms. Carson testify to that detail. The jury clearly believed her testimony that she previously lied to the police about the shooting because she was scared but was then forthcoming in court when she testified that the defendant was the shooter. We see no reason to disagree with that resolution. "The trier of fact must judge how flaws in parts of a witness's testimony, including inconsistencies with prior statements, affect the credibility of the whole." *Corral*, 2019 IL App (1st) 171501, ¶ 85.

¶ 34    In sum, the witness testimonies at issue identifying the defendant as the shooter were reliable and credible. The evidence was therefore sufficient to prove beyond a reasonable doubt,

that the defendant was the shooter in this case and proved him guilty. We accordingly affirm his convictions.

¶ 35    Next, the defendant argues that the trial court erred in not providing IPI 3.17 to the jury. He argues that there was sufficient probable cause to believe that Ms. Carson was involved in the shooting, and so the trial court should have provided the jury with the accomplice witness instruction regarding her testimony.

¶ 36    IPI 3.17, commonly known as the accomplice witness instruction, provides: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." IPI Criminal, No. 3.17 (4th ed. 2000). In determining whether the accomplice witness instruction should be given to the jury, the trial court considers whether there is probable cause to believe that the witness was guilty of the offense either as a principal or as an accessory. *People v. Strickland*, 2019 IL App (1st) 161098, ¶ 43. If the trial court determines that there is insufficient evidence to justify giving the accomplice witness instruction to the jury, its determination will not be overturned except for a finding of an abuse of discretion. *Id.*

¶ 37    Here, Ms. Carson testified that she was surprised when she realized that the defendant was planning to open gunfire on the group of men, and even told him "not to do it." And there is no evidence that Ms. Carson *participated* in the shooting, supporting the trial court's finding that she was not an accomplice. See *id.*, ¶ 51 (to constitute an accomplice, a person must take some part, perform some act, or owe some duty to the person in danger that makes it incumbent on her to prevent the commission of the crime). It is true that Ms. Carson was sitting in the car that shot at the group of men and then drove away, but it is well established that a person is not accountable

by her *mere presence* at the scene of the crime. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 26. Further, even though Ms. Carson testified that she initially lied to the police by telling them that she was not present during the shooting, she explained at the trial that she lied because she was "scared" and "didn't want to go to jail for something [she] didn't do." Such circumstances are insufficient to give rise to probable cause that Ms. Carson was an accomplice in the shooting, especially considering the lack of other evidence showing that she participated in the offense. Simply put, under these facts, the trial court did not abuse its discretion in denying the defendant's request to provide the jury with IPI 3.17. See *People v. Najar*, 2018 IL App (2d) 160919, ¶ 18 (an abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it).

¶ 38    Finally, the defendant claims that his 61-year sentence violates the proportionate penalties clause. He asserts that because he was 22 years old at the time of his offense, the trial court "failed to give adequate weight to [his] youthful characteristics" pursuant to the tenets of *Miller*, and so his 61-year sentence is an unconstitutional *de facto* life sentence. His argument is based on recent case law governing the sentencing of juveniles and young adult offenders, which is an evolving area of law.

¶ 39    While there has been a recent trend to expand *Miller's* sentencing protections for juveniles to young adult offenders, pursuant to the proportionate penalties clause of the Illinois Constitution, the case law strictly applies to young adult offenders *under the age of 21*. See *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33 (while there has been an expansion of the *Miller* protections, those expansions have been restricted to individuals who were between 18 and 20 years old). And it is undisputed that the defendant was 22 years old when he committed his offenses. Thus, the *Miller*

tenets which the defendant relies upon cannot be applied to him.[6] We recognize that the evolving science of brain development may support *Miller* claims for those over 20 at some point in the future. But as this court has previously noted, such an expansion should be made by the legislature or the Illinois Supreme Court. *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 27. "[F]or now[,] individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *Humphrey*, 2020 IL App (1st) 172837, ¶ 33. Therefore, we reject the defendant's challenge to his sentence and, thus, the defendant's 61-year sentence is affirmed.

¶ 40                                                      CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.

---

[6]We also note that, notwithstanding, the trial court in this case *did* consider the *Miller* factors in sentencing the defendant, even though it was not required to do so.